JOSEPH TEMPFER, *Appellee,* v. THE JOPLIN & PITTS-
BURG RAILWAY COMPANY, *Appellant.*

No. 18,098.

SYLLABUS BY THE COURT.

1. NEGLIGENCE — *Sitting on Railway Track — Unconscious — Wantonness of Motorman.* One who carelessly sits down upon the ties of an interurban electric railway track to await the arrival of a car is not continuously and concurrently negligent by reason of becoming unconscious from sleep or coma and thereby unable to avoid injury from a car wantonly run upon him.

2. ———— *Same.* A motorman who sees and realizes the helpless condition and peril of such person in time to stop his car and avoid injuring him, but recklessly runs it upon and over him without attempting to stop until almost upon him, is guilty of wanton negligence, rendering his employer liable for such injury, although he does not run over him willfully and intentionally.

3. CONTRIBUTORY NEGLIGENCE—*Concurrent Negligence—Proper Instructions.* The company pleaded contributory negligence in sitting down and remaining upon the tracks knowing that a car would soon pass, and the court having instructed correctly as to concurrent negligence and last clear chance, charged that if the deceased was guilty of carelessness continuing down to the time of the negligence of the defendant, if any, which contributed to the injury, there could be no recovery unless the defendant came within the exception to the rule precluding the defense of contributory negligence. *Held,* properly applicable to the defense pleaded.

Appeal from Cherokee district court. Opinion filed April 12, 1913. Affirmed.

*Andrew H. Skidmore, Stephen L. Walker,* both of Columbus, *John P. Curran,* of Pittsburg, and *Edward C. Wright,* of Kansas City, Mo., for the appellant.

*C. A. McNeill, E. V. McNeill,* and *Al. F. Williams,* all of Columbus, for the appellee; *Charles Stephens,* of Columbus, of counsel.

The opinion of the court was delivered by

WEST, J.: Plaintiff sued to recover damages for the loss of his son who, he alleged, was killed by one of the defendant's cars. The petition averred, in substance, that on August 21, 1910, and for a long time prior thereto, the defendant at a point on its line known as Fleming station kept a rest room or depot for the accommodation of passengers; that shortly before that date the depot was removed, but that the place continued to be used as a stopping place for passengers, where they were received and discharged, and that a large number of passengers constantly congregated there and used such stopping place; that on the day mentioned the son went to the station at this place for the purpose of becoming a passenger; that he had been accustomed to going there and knew that the defendant still stopped its cars at that point; that he arrived there at about 9 o'clock P. M., and finding no place provided to sit down and rest, sat down on the end of one of the ties of the defendant's road, that being the only place to be found at or near the stopping place to rest and wait for one of defendant's cars, and while so waiting he fell asleep and became unconscious of his surroundings or the approach of any car; and about 9:15 o'clock the defendant wantonly, willfully, recklessly and with gross carelessness and negligence, after its motorman who was running the car saw the deceased several hundred feet away and asleep and unconscious and in plenty of time to have stopped the car, ran the same over and killed him. The answer alleged, among other things, that if the plaintiff's son was killed it was on account of his own carelessness, fault and negligence in going upon the tracks and sitting down and remaining there. Testimony was introduced to the effect that the car was loaded and running in the neighborhood of fifteen miles an hour and could have been stopped within 150 to 200 feet, and that the

motorman saw the deceased 300 feet or more before running over him. One witness testified that he was a passenger on the car and saw something on the track that looked like a man and told the motorman; that he again arose and told the motorman that it was a man, but that the motorman made no reply and simply turned his head; that the car was 300 or 350 yards from the object when this witness first saw it; that the motorman did not slacken the speed until within ten or fifteen feet of the deceased, who was sitting on the tie close up to the east rail facing east, in a stooping position with his head in his hands. Another witness testified that:

"A big tall fellow said there was a man on the track, but it never took no effect at all, it kind'a stirred them up. I got up and saw something sitting on the tie there stooped over like. I think the tall man said 'there is a man there.' The car did not slacken up after that that I noticed."

Another witness testified that he was on the car.

"When I first heard this tall man say there is a man on the track the car, in my judgment, was about 300 or 350 feet from him. The car did not seem to slow a bit."

Numerous witnesses denied that there was any tall man on the car who thus notified the motorman, and various others gave evidence to the effect that the motorman did all he could to stop the car after discovering that the object on the track was a man. The jury among other things found that the motorman saw the deceased several hundred feet away on the track in a dangerous place, apparently asleep, in time to have stopped the car without injuring him; that had he taken such measures as were in his power at the time he first discovered the object on the track and after he knew and recognized it to be a man who would not leave the track he could have stopped the car before striking him; that the motorman was in no doubt as to the nature of the object on the track when he

Tempfer v. Street Railway Co.

first discovered it. In answer to a question whether the motorman, as soon as he discovered that it was a man and that he was in peril and would not move, applied the air to the brakes and reversed the motion of the car, they answered "No." Question No. 24 was:

"Did the motorman, Dan Daetwyler, while operating car No. 64, on the night of August 21, 1910, while approaching Louis Tempfer, wantonly, wilfully and intentionally after he knew that such object was a human being, and that it would not leave the track, run his car upon and over him."

To this the jury first answered "Don't know;" and on being sent back returned instead the answer "Carelessly."

The jury were instructed that their chief inquiries were whether the deceased met his death through the wanton, willful, reckless negligence of the defendant, and if so of what such carelessness and negligence consisted; whether the defendant used ordinary care and caution in the operation of its car after the motorman saw and recognized that the deceased was a human being on the track in a perilous or dangerous position, asleep or apparently helpless, and whether the deceased was killed by reason of his own negligence or by reason of the defendant's gross, wanton or reckless carelessness and negligence; that the contributory negligence of the plaintiff would not avail the defendant, "if it be shown that the defendant by the exercising of reasonable care and prudence after having discovered the deceased in a dangerous position, and a place of peril, apparently asleep, or unconscious of the said dangerous and perilous position he was in and in time to stop the car and thereby not injured him, and failed to do so, and run over him and killed him"; that under such circumstances "the doctrine of contributory negligence has no place, the defendant would be liable for any injury inflicted irrespective of the faults which places the injured party in the way of such injury." Reckless-

ness and wantonness were correctly defined. It was left to the jury to determine whether the act of the deceased in going upon the premises of the railroad company to become a passenger and finding no place provided sat down on a tie to rest was contributory negligence, but they were told that in any event he should use due care and diligence in looking out for the cars and doing everything a reasonably prudent person would do to avoid injury, "but if he falls asleep while there and becomes unconscious of his surroundings and his danger, and the defendant's agents observe such conditions and facts in time to stop its cars and to avoid an injury, and fails so to do and kills him, the company would be liable." In the 15th instruction the jury were specifically told that if the deceased was guilty of carelessness and negligence continuing down to the time of the negligence or carelessness, if any, of the defendant which contributed to the injury or death "there could be no recovery, unless as I have said the defendant comes within the exception to the rule which I have stated, precluding the defense of contributory negligence." The defendant requested certain instructions which were refused, but some of which were substantially covered by those given. One, however, was refused and not otherwise covered, that before they could find the defendant guilty of willful and wanton negligence they "must find that the defendant's motorman, after he discovered said Louis Tempfer on the track and realized that he could not or would not leave it, purposely and willfully ran his car onto and over said Louis Tempfer."

It is contended by the defendant that the court erred in overruling a demurrer to the evidence, in giving and refusing instructions, and in refusing a judgment for the defendant. We have examined the instructions given as well as those refused and are of the opinion that the law was fairly and correctly stated by the trial court.

Tempfer v. Street Railway Co.

That the demurrer to the evidence was properly overruled is indicated by quotations from the evidence already made. It is contended that the finding that the motorman ran upon the deceased carelessly is equivalent to a finding that he did do so willfully or intentionally. But the court made it plain to the jury that the plaintiff could not recover unless the motorman did recklessly or wantonly run the car upon the deceased after realizing that he was unconscious or helpless and in a place of peril, and the answer to the question just referred to, taken in connection with the general verdict and the other finding, is not so inconsistent therewith as to destroy its force or effect, and is by no means a sufficient basis for a judgment in favor of the defendant.

It was not necessary in order for the plaintiff to recover that the jury should find that the motorman ran over the deceased willfully or intentionally, and we attribute to him no such malevolent purpose. It was essential, however, to find that he did so recklessly or so heedlessly as to amount to wanton indifference to the rights of Louis Tempfer, and the testimony already referred to supported such conclusion. (*Telegraph Co. v. Lawson,* 66 Kan. 660, 663, 72 Pac. 283; *Railway Co. v. Lacy,* 78 Kan. 622, 97 Pac. 1025; *Railway Co. v. Baker,* 79 Kan. 183, 98 Pac. 804; 29 Cyc. 509.)

It is vigorously contended that the testimony of the witness referred to as the tall man was false, but it was corroborated by two other witnesses, and the jury and the trial court appear to have given it credence, and it is not for us to reject it. (*Wible v. Street Railway Co.,* 88 Kan. 55, 127 Pac. 625.)

It is also sought to be pressed upon us that neither the evidence nor the instructions were in accord with the doctrine of the last clear chance, but the instructions appear to have stated the rule clearly and correctly. It would seem, however, that the defendant, in reiterating the correct rule that the doctrine has no

place in cases wherein the negligence is concurrent, assumes that if the deceased negligently sat upon the tie, then he was continuously negligent in falling asleep or becoming unconscious. But this is not correct. However negligently he came to the place of danger, if when the car approached he had done all in his power to get out of its way it could not be said that this was a continuation of his negligence. On the contrary, his negligence would have turned to the highest degree of diligence. If, however, he was unconscious from sleep or coma, he had no ability while in that condition to extricate himself, and having no power to exercise diligence he was not negligent for failing to exercise it. Had he gone upon the track for the express purpose of trespassing and fallen and broken both legs and lain there helpless the defendant would have had no right to run over him after actually discovering his condition and peril. As the evidence does not disclose the cause of his unconsciousness, it can not be attributed to a criminal design to derail the car or to commit suicide. According to the findings we have the simple fact that he was there totally oblivious of his danger because of a cessation of his mental faculties from some unknown cause. This can not be said to constitute continuing negligence, which could exist only in case he was in condition to realize his danger and help himself.

That portion of instruction No. 15 already quoted, that if the deceased was guilty of carelessness and negligence continuing down to the time of the negligence or carelessness, if any, of the defendant, which contributed to the injury, there could be no recovery unless the defendant came within the exception to the rule precluding the defense of contributory negligence, is said to be entirely inapplicable to a case of last clear chance, because it charged that the plaintiff could recover even if he "was guilty of negligence that continued down to the time of the accident." But negli-

gence down to the time of the negligence of the defendant is not negligence down to the time of the accident. It must be remembered, too, that the principal defense pleaded was the contributory negligence of the deceased in "sitting down on said tracks and remaining thereon, . . . knowing that a car would soon pass along said tracks, and knowing the danger of sitting on said tracks," and the defendant was entitled to an instruction framed on this theory, and we think this was what the court was giving, and that it was proper and not in conflict with others expressly stating the doctrine of the last clear chance.

Error is assigned in receiving what is asserted to have been a quotient verdict. Following what the writer regards a vicious custom, affidavits pro and con were received in evidence to show the mental processes used by the jury in arriving at their verdict. The trial court weighed the evidence thus produced and decided the question of fact thereby added to the litigation in favor of the plaintiff, and this, like any other supported finding of fact, must remain undisturbed.

Finding no prejudicial error in the record, the judgment is affirmed.